

FILED

Jan 17 2018, 7:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Trenna S. Parker
Trenna S. Parker Law Office, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of: Q.J., Jr., Q.J., Bre.J., Ba.J., Bri.J., and Bro.J., Children in Need of Services, | January 17, 2018 |
| | Court of Appeals Case No. 29A04-1706-JC-1482 |
| Q.J., Sr. (Father), | |
| *Appellant-Respondent,* | Appeal from the Hamilton Superior Court |
| v. | The Honorable Todd L. Ruetz, Magistrate |
| Indiana Department of Child Services, | The Honorable Steven R. Nation, Judge |
| *Appellee-Petitioner.* | Trial Court Cause Nos. 29D01-1608-JC-1036 29D01-1608-JC-1037 29D01-1608-JC-1039 29D01-1608-JC-1040 29D01-1608-JC-1041 29D01-1608-JC-1042 |

**Najam, Judge.**

## Statement of the Case

Q.J., Sr. ("Father") appeals the trial court's adjudication of his six minor children as children in need of services ("CHINS").[1] The Children are: Q.J., Jr., born September 11, 2001; Q.J., born December 28, 2002; Bre.J., born May 19, 2005; Ba.J., born December 31, 2008; Bri.J., born June 25, 2011; and Bro.J., born May 17, 2013, ("the Children").[2] Father raises four issues for our review, which we restate as the following three issues:

1.  Whether the trial court abused its discretion when it allowed Dr. Demetris to testify as to statements Q.J., Jr. had made to her during her examination of him.

2.  Whether there was sufficient evidence to support the trial court's adjudication of the Children as CHINS.

3.  Whether Father was denied the effective assistance of counsel.

We affirm.

## Facts and Procedural History

On August 24, 2016, Q.J., Jr., who was fourteen years old, ran away from home. Father and B.J. ("Mother") filed a report with the Carmel Police Department. Officer Blake Lytle responded to the call and first observed Q.J.,

---

[1] The Children's mother does not participate in this appeal.

[2] Q.J., Jr. and Q.J. are both males and will be referred to collectively as "the Boys." Bre.J., Ba.J., Bri.J., and Bro.J. are females and will be referred to collectively as "the Girls."

Jr. that night wearing a black shirt and blue boxers. When Q.J., Jr. saw Officer Lytle, he ran. Q.J., Jr. eluded officers until the next morning. On August 25, officers located Q.J., Jr. and discovered that he had slept under a box in the woods. Q.J., Jr. had two stolen backpacks with him that were filled with stolen food. Officer Lytle was present when officers located Q.J., Jr. Officer Lytle observed Q.J., Jr. limping, so he arranged for a medic to examine him. Officer Lytle thought that Q.J., Jr. appeared skinny and he was concerned that Q.J., Jr. was being abused, so he notified his supervisor in order to have a detective interview Q.J., Jr. While the medics examined him, Q.J., Jr. told Officer Lytle that "things were going on at home." Tr. Vol. III at 35.

[4] Master Patrolman David Vanderbeck was also on the scene when officers located Q.J., Jr. Officer Vanderbeck was shocked by Q.J., Jr.'s appearance. He observed that Q.J., Jr. was "just like skin and bones. He was really small." *Id*. at 18. Officer Vanderbeck was concerned about Q.J., Jr.'s health and well-being, so he also called the fire department to have the medics examine him. When Officer Vanderbeck asked Q.J., Jr. why he ran away, Q.J., Jr. got "all teary-eyed and stuff" and said he "was too scared to tell [Officer Vanderbeck] because his mom and dad would find out what he told [Officer Vanderbeck]." *Id*. at 19. Officer Vanderbeck suggested to Sergeant Brady Myers that their investigation division be notified about the situation. Sergeant Myers contacted Detective Nancy Zellers. Officer Vanderbeck then transported Q.J., Jr. to the police station.

[5] After Q.J., Jr. arrived at the police station, Detective Zellers conducted a forensic interview of him. During the interview, Q.J., Jr. described abuse he and his siblings endured at home. He said that there were cameras set up in the home to monitor their behavior and that they were denied ready access to food, which was kept in the master bedroom closet. Q.J., Jr. also said that he was being abused and that "food was being withheld and that he was being beaten." Tr. Vol. II at 243. Detective Zellers stated that Q.J., Jr. "did not have the appearance of being a well-nourished child." *Id.*

[6] At the police station, Detective Zellers spoke with Mother. Mother told Detective Zellers that "she was frustrated, that . . . [Q.J., Jr.] was ruining their lives." *Id.* at 225. She further said that Q.J., Jr. "was evil, he was a liar, he was a kleptomaniac because he stole food from their pantry, he stole food from dumpsters and ate it." *Id.* Based on Mother's description of the events, Detective Zellers became concerned that Q.J., Jr. was being neglected and abused. Detective Zellers determined that Q.J., Jr. should be taken to the hospital because "he did not look well. He appeared emaciated and just did not look well, sunken eyes." *Id.* at 224-25.

[7] Detective Zellers obtained a search warrant for Mother and Father's home to corroborate Q.J., Jr.'s statements. Detective Zellers executed the search warrant on the evening of August 25 and found cameras in the home, but there were no stored images. Another officer determined that there was food in the master closet.

[8]     Peyton Lill, a Family Case Manager ("FCM") with the Indiana Department of Child Services ("DCS"), was assigned to investigate the safety and well-being of the Children after she received a report that Q.J., Jr. had run away and that there was physical abuse. Lill went to the police station and interviewed Q.J., Jr. On August 27 at approximately 3:00 P.M., Lill was able to speak with all of the Children except Q.J., Jr. All five of them said they had not yet eaten on that day.

[9]     After Zellers and Lill interviewed Q.J., Jr., he was transported to the hospital and admitted. On August 26, Doctor Cortney Demetris evaluated him. Dr. Demetris was concerned about Q.J., Jr.'s "weight and malnutrition as well as some injuries and some lab abnormalities." *Id.* at 96. Dr. Demetris' initial concern was that Q.J., Jr. was malnourished because "he was so underweight and he was so small for his age and he had laboratory findings that were consistent with malnourishment." *Id.* at 99. When he was admitted to the hospital, Q.J., Jr. weighed approximately seventy-two pounds. Dr. Demetris reviewed the results of laboratory work that had been done on Q.J., Jr. Dr. Demetris found that Q.J., Jr. had "an elevated CPK[,] which is an enzyme that is released from the muscle if there's time when the muscle is damaged or stressed. He also had a very low prealbumin[,] which is a marker for nutritional status, specifically as it relates to proteins and protein malnutrition." *Id.* at 107. In addition to her concerns about malnourishment, Dr. Demetris also observed an abrasion on Q.J., Jr.'s chin; some tenderness and swelling on his ankle; and

some bruising over his lower back, the top of his buttocks, on one of his hips, and on his chest.

[10] On August 26, and on two other occasions, Dr. Demetris spoke with Mother about Q.J., Jr. Mother stated that Q.J., Jr. would eat fruit for breakfast, a Lunchable or leftovers with some chips for lunch, and a homecooked meal or dinner out with the family for dinner. Mother further stated that Q.J., Jr. would frequently steal and exhibit other difficult behaviors and that she "was going to provide him with the kind of basic three meals a day and he would not be allowed to have any extra as a result of negative consequences for these behaviors that he was exhibiting." *Id*. at 119. Mother told Dr. Demetris that Q.J., Jr. would steal food and eat food out of trash cans. She said that he would also steal nonfood items like protein powder from Mother's purse. Dr. Demetris asked Mother if, based on his degree of malnutrition, Mother felt he was stealing food because he was starving. Mother said she "felt that [Q.J., Jr.] was getting enough food each day[.]" *Id*. at 121. Mother said she was not going to give him any extras beyond three meals a day, which Mother said is "the minimum she was required to provide him as his parent[.]" *Id*. at 122. Mother also told Dr. Demetris that the Children can have extra food if they speak up about their siblings' misbehaviors. Dr. Demetris was concerned about Q.J., Jr.'s siblings "based on the history that was provided to me by [Q.J., Jr.] and his mother." *Id*. at 128. Dr. Demetris recommended that the other children be evaluated to determine if they were malnourished or if they had any injuries consistent with physical abuse.

[11] A few days later, Dr. Demetris examined Q.J., Jr.'s brother, Q.J., who was thirteen years old. When Dr. Demetris examined Q.J., he had already been admitted to the hospital because of malnutrition. Dr. Demetris was concerned about Q.J.'s weight. She was also able to observe bruising on the lower part of his back and scratches around his ankles or lower extremities. Dr. Demetris examined Q.J. and ran tests, but she was not able to speak with Q.J.'s parents because they were unavailable. Q.J. provided Dr. Demetris with very little history. However, based on Q.J., Jr.'s history and the statements Mother made to Dr. Demetris at the time Dr. Demetris examined Q.J., Jr., Dr. Demetris was concerned about Q.J. Q.J. did not specifically talk to Dr. Demetris about exercise, but Q.J. told the admitting team that his exercise involved "several hundred repetitions of certain exercise movements and lasting several hours." *Id.* at 139. Dr. Demetris ran diagnostic tests on Q.J. Q.J.'s prealbumin levels were on "the low end of normal, being 18 in our lab, 18 being the low end of normal, 17 being considered abnormal, and his was 18." *Id.* He also had elevated liver function tests and low Vitamin D levels. Based on the tests, Dr. Demetris diagnosed Q.J. with moderate to severe malnutrition with no underlying medical condition that could explain it. Dr. Demetris was also concerned about the bruises she found on Q.J. based on the history provided by Q.J., Jr. Q.J. was discharged from the hospital after a few days. On September 14, Q.J., Jr. was discharged from the hospital after Dr. Demetris saw significant improvement in his weight. On that date, he weighed eighty-seven pounds and twelve ounces.

[12]     In the meantime, on August 30, 2016, DCS filed CHINS petitions for each of the Children. On that same day, the trial court held a detention hearing. After the hearing, the trial court found that Q.J., Jr. should continue to remain outside of Mother and Father's home, and the trial court ordered the removal of the five other children. Also on August 30, the State charged both Mother and Father with two counts of neglect of a dependent, as Level 6 felonies, based on the Boys' malnutrition. The State later added a third charge against Mother and Father for neglect of a dependent resulting in bodily injury, as a Level 5 felony, due to Q.J., Jr.'s severe malnutrition.

[13]     On November 17, Dr. Sarah Szerlong conducted a clinical interview and assessment of Bre.J. and Ba.J. After the assessments, Dr. Szerlong completed a report for each of the girls. In her report for Bre.J., Dr. Szerlong wrote that Bre.J. had reported that "her parents would make her brothers, [Q.J., Jr. and Q.J.,] work 'really hard and do chores until 4 in the morning.'" Ex. at 108. She had further stated that "her parents would sometimes make her brother run around outside and would smack him up on the head." *Id.* Further, Bre.J. reported that her father "becomes angry easily and has a history of smacking her brother." *Id.* Bre.J. had also reported "witnessing her father hit her brothers and engage in corporal punishment, and witnessing verbal arguments between her parents." *Id.* at 113. In her report for Ba.J., Dr. Szerlong reported that Ba.J. had "shared that her parents have a history of domestic disputes, one where her mother reportedly held a knife and scissors up to her father's neck. She acknowledged feeling fearful when witnessing this and other domestic

violence between her parents." *Id*. at 118. Ba.J. had also reported that Father "has 'whooped' her on several occasions." *Id*. Ba.J. had "reported incidents of domestic violence between her parents occurred multiple times." *Id*. at 119. Ba.J. had also "stated she has seen her mother attempt to kill her brother, [Q.J., Jr.]." *Id*. at 122. Dr. Szerlong's report indicated that "[Ba.J.] is struggling with a variety of depression, anxiety, and trauma[-]related symptoms." *Id*. at 125.

[14] In January 2017, Mother requested an independent medical examination of Q.J., Jr. and Q.J. Dr. Amanda Beach examined Q.J. on January 23, and she examined Q.J., Jr. on January 25. For her appointment with Q.J., Jr., Dr. Beach did a complete physical examination and reviewed the discharge notes from the hospital. By the time Dr. Beach examined Q.J., Jr. in January, he had gained thirty-one pounds and had grown two inches since he was discharged from the hospital. When Dr. Beach examined Q.J. in January, he had gained six pounds since he was discharged from the hospital.

[15] On March 3 and March 7, 2017, the trial court held a fact-finding hearing on the CHINS petitions. As a preliminary matter, DCS moved to admit the clinical interview assessments for Bre.J. and Ba.J. Both Mother and Father stated that they did not object, and the trial court admitted the assessments as evidence. During the hearing, DCS presented as evidence the testimony of Officer Lytle; Officer Vanderbeck; Detective Zellers; Dr. Demetris; Dr. Beach; Emily Sabau, Q.J., Jr.'s therapist; Lill; FCM Amanda O'Connell; Bertha Push, the therapist for Bre.J. and Ba.J,; and Robin Allen, the therapist for Bri.J. and Bro.J.

[16] Dr. Demetris testified during the hearing about her examination and diagnosis of Q.J., Jr. The attorney for DCS asked Dr. Demetris what Q.J., Jr. said was the cause for his malnourishment. Father objected on hearsay grounds, but the trial court overruled his objection. Dr. Demetris testified that she did not specifically ask Q.J., Jr. what had caused his malnourishment but, instead, asked questions about what he ate and what he was offered, but "he gave a history of a fairly limited amount of food availab[le] to him." Tr. Vol. II at 97. Dr. Demetris further testified that Q.J., Jr. "advised that he was restricted from having access to food as a form of punishment" and "that he would be restricted from having lunch, for example, if he was in trouble on that day." *Id.* Dr. Demetris further testified that Mother gave a history about the amount of food that Q.J., Jr. was provided that was very similar to the history Q.J., Jr. gave.

[17] Dr. Demetris testified that, at almost fifteen years old, Q.J., Jr. weighed approximately seventy-two pounds. She testified that the "average weight for a child of that age is closer to approximately, maybe 130 to 140 pounds." *Id.* at 108. She also testified that, based on the history Q.J., Jr. gave her regarding his food intake, she concluded that he was eating "less than 50 percent of what was calculated as would be what he would need for his calories for growth." *Id.* at 113-14. She further testified that she "was not able to find any underlying medical condition that would explain his malnourishment." *Id.* at 114. Dr. Demetris testified that "it would take weeks to months for [Q.J., Jr.] to have that degree of malnourishment." *Id.* at 115. She further stated that "he would

be at risk for significant negative health complications, including death, if he continued to have that degree of malnutrition in the comings weeks to months." *Id.* Dr. Demetris testified that Mother did not believe Q.J., Jr. was malnourished, even after Dr. Demetris spoke with her "at some length, making an attempt to help her understand why it was my medical diagnosis that he had severe malnutrition[.]" *Id.* at 125.

[18]    Dr. Demetris testified regarding her examination and diagnosis of Q.J. She testified that when Q.J. was admitted to the hospital, he was significantly below the growth chart for his weight and he was in the 50th percentile for height. She testified that Q.J.'s level of malnutrition "would have taken at least weeks to months." *Id.* at 140. She further testified that had "he continued to have that degree of malnutrition he was at risk for medical complications, including death[,] in the weeks to months in the future*." Id.* She also testified that the malnutrition and the bruises to the back "would not normally be present without an act or omission by the parents." *Id.* at 141. However, she testified that she could not say for certain that the bruises and scrapes were caused by Mother or Father. Q.J. weighed sixty-two pounds on August 30, 2016. On January 23, 2017, he weighed sixty-eight pounds and 6.4 ounces.

[19]    DCS also presented the testimony of Lill, a FCM. Lill testified that Mother had stated that Q.J., Jr. had ruined their lives. Lill further testified that Mother had "stated they use exercise as a discipline method. They take away snacks. And at the time they were taking away his clothes. They thought that it was a good punishment so that he wouldn't run away. He was only allowed to wear his

underwear." Tr. Vol. III at 61. Lill testified that she did not recommend returning the Children to the care of Mother and Father "[b]ased on everything that [Q.J., Jr.] was telling me, how severely malnourished [Q.J.] and [Q.J., Jr.] were, the physical abuse, and the marks and bruises on both children, the behaviors of the other children, and specifically the children, what they had to say about [Q.J., Jr.], they all called him evil and they hated him, etcetera." *Id.* at 86. In regards to the Girls, Lill testified as to what made her decide that they should not go back to their parents. She stated:

> So we'll start with [Bri.J.]. She called . . . [Q.J., Jr.] evil multiple times in [her forensic interview]. She stated, and she's five. And she stated that the eating situation and that [Q.J., Jr.] wasn't allowed to eat with them and [Q.J., Jr.] actually had to eat upstairs so that he wouldn't steal their food. And that shocked me because it was a five-year-old. [Bre.J.] said the same thing. She mentioned all the discipline that the parents made [Q.J., Jr.] do and her and [Q.J.]. She also talked about the food restrictions and them stealing food. And [Ba.J.], she mentioned how awful [Q.J., Jr.] was and the discipline and stuff like that so.

*Id*. at 89-90.

[20] Amanda O'Connell also testified. She was the FCM who was assigned to the case at the end of December 2016. O'Connell testified that she had recommended services, including home-based therapy for both parents, psychological evaluation for both parents, and Father Engagement for Father. However, those referrals were discharged due to noncompliance. She testified that she was not able to recommend that the Children return to the care of their

parents out of concerns for their safety. She testified that "for the safety of the children the parents will need to engage in services. The children need to continue with their therapy to address their trauma." *Id.* at 120.

[21] Bertha Rush is a home-based therapist who has worked with Bre.J. and Ba.J., who are eleven and eight years old, since the end of October 2016. She also testified at the fact-finding hearing. She testified that she works with Bre.J. and Ba.J. to address "some trauma that's been reported to me by the girls." *Id.* at 127. Rush testified that she would not recommend that Bre.J. and Ba.J. return to the care of their parents because "they still have quite a bit to work through. It's also been told to me by one of the girls that they're not ready to go home yet." *Id.* at 129.

[22] Finally, DCS presented the testimony of Robin Allen. Allen is a home-based therapist who has worked with Bri.J., and Bro.J., who are five and three years old, since early November 2016. Allen testified that she would not recommend that Bri. J. and Bro.J. return to the care of their parents at this time. She further testified that Bro.J. "talk[s] about being afraid of visits and going home, things like that." *Id.* at 143.

[23] Father presented the testimony of William Ellery. Ellery coaches Little League baseball for Carmel Dad's Club, and Q.J. was on his team in the spring of 2015. Ellery testified that "the relationship with [Q.J.] and his dad was just, it was always good." *Id.* at 46. He further testified that the relationship between Q.J. and Father was always positive and that there was a lot of interaction between

Father, Q.J., and Q.J., Jr. that Ellery said was "a really nice family situation to see." *Id*. at 47. Neither Mother nor Father testified. On March 28, 2017, the trial court entered its orders, which contained findings and conclusions and which adjudicated the Children to be CHINS. This appeal ensued.

## Discussion and Decision

### *Issue One: Testimony of Dr. Demetris*

[24] Father first contends that the trial court abused its discretion when it allowed Dr. Demetris to testify about the statements Q.J., Jr. made to her regarding the source of his bruises and malnutrition because the statements were hearsay. A trial court's decision regarding the admission of evidence is squarely within that court's discretion, and we afford it great deference on appeal. *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013). We will not reverse such a decision unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law. *Id*. A hearsay statement is one that is not made by the declarant while testifying at the trial or hearing and that is offered to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay statements are generally not admissible unless they fall within an exception outlined in the Indiana Rules of Evidence. Evid. R. 802.

[25] Indiana Evidence Rule 803(4) permits statements made for the purpose of medical diagnosis or treatment to be admitted into evidence. The rule requires that the "statements must be 'made by persons who are seeking medical diagnosis or treatment and describing medical history, or past or present

symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.'" *VanPatten*, 986 N.E.2d at 260 (quoting Evid. R. 803(4)). The "exception is grounded in a belief that the declarant's self-interest in obtaining proper medical treatment makes such a statement reliable enough for admission at trial[.]" *Id.*

> This belief of reliability, though, necessitates a two-step analysis for admission under Rule 803(4): First, "is the declarant motivated to provide truthful information in order to promote diagnosis and treatment," and second, "is the content of the statement such that an expert in the field would reasonably rely on it in rendering diagnosis or treatment."

*Id.* (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)).

[26] Father specifically contends that Q.J., Jr.'s statements to Dr. Demetris were hearsay because "the record is devoid of testimony to establish that Q.J.[,] Jr. knew that he was talking to a professional for the purposes of making a diagnosis" and because "it is not readily apparent that Q.J.[,] Jr. was motivated to tell the truth." Appellant's Br. at 14. To support his contention, Father relies on *Bartrum v. Grant County Office of Family and Children (In re W.B.),* 772 N.E.2d 522 (Ind. Ct. App. 2002). In that case, the trial court admitted statements that children had made to their therapists under Indiana Evidence Rule 803(4). On appeal, this Court concluded that the statements made by the children met the second prong of the test found in *McClain*, but we held that the record was "devoid of any evidence . . . that the children, in making these statements, were

'motivated to provide truthful information in order to promote diagnosis and treatment.'" *Id*. at 533 (quoting *McClain*, 675 N.E.2d at 331). In particular, we observed that the testimony of the children's therapist "clearly portrayed the young children as mentally and emotionally incompetent, and no doubt totally unaware of [the doctor's] professional purpose." *Id*. Further, we stated: "Where that inference is not obvious, as in this case involving a *young* child brought to treatment by someone else, there must be evidence that the declarant understood the professional's role in order to trigger the motivation to provide truthful information." *Id*. (quoting *McClain*, 675 N.E.2d at 331) (emphasis added). Thus, we held that the doctor's testimony did not meet the first prong of the test.

[27] In the present case, Father asserts that, like in *In re W.B.*, the "record is devoid of testimony to establish that Q.J.[,] Jr. knew that he was talking to a professional for the purposes of making a diagnosis or treatment." Appellant's Br. at 14. But in *In re W.B.*, the children who made the statements to the therapist were young. The oldest child in that case was five years old when the children were determined to be CHINS. Further, the record contained evidence that the children were mentally incompetent. Because the children were young and otherwise mentally incompetent, we held that the inference that they were motivated to provide truthful information in order to promote diagnosis and treatment was not obvious. *Id*.

[28] In contrast, here, Q.J., Jr. was not a young child. Q.J., Jr. made his statements to Dr. Demetris while he was in the hospital on August 25, 2016, which was

approximately three weeks prior to his fifteenth birthday. Based on Q.J., Jr.'s age and the fact that he made the statements to a doctor while in a hospital, the inference that he knew he was talking to a medical professional and that he was motivated to provide truthful information is obvious. Therefore, Dr. Demetris' testimony about Q.J., Jr.'s statements fell within the hearsay exception under Evidence Rule 803(4), and the trial court did not abuse its discretion when it admitted those statements.

### Issue Two: Sufficiency of the Evidence

[29] Father next contends that there was insufficient evidence to sustain the trial court's determination that the Children are CHINS. Our Supreme Court has recently reiterated our standard of review.

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id*. at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id*. (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr.J. and J.J. v. Ind. Dep't. of Child Serv. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

*The Boys*

[30] Father asserts that "it was erroneous to find that there was sufficient evidence to find that Father either physically abused or malnourished the children." Appellant's Br. at 17. DCS alleged that the Boys were CHINS pursuant to Indiana Code Section 31-34-1-1, which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *J.B. v. Ind. Dep't. of Child. Serv. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[31] We agree with DCS that the evidence most favorable to the trial court's findings supports its conclusion that the Boys were CHINS pursuant to Indiana Code Section 31-34-1-1. DCS introduced the following evidence at the fact-finding hearing:

- Officer Lytle's testimony that Q.J., Jr. had two backpacks full of stolen food and that he was very skinny when officers found him.
- Officer Vanderbeck's testimony that Q.J., Jr. looked like he just stepped out of a World War II prison camp.
- Detective Zellers' testimony to the following:
  - Q.J., Jr. said that food was being withheld.
  - Q.J., Jr. did not have the appearance of being a well-nourished child and he appeared emaciated.
  - Mother told her that Q.J., Jr. was ruining their lives and that he was a kleptomaniac because he stole food from their pantry and from dumpsters.
- Dr. Demetris' testimony to the following about Q.J., Jr.:
  - He was underweight, he was small for his age, and he had laboratory findings that were consistent with malnourishment.
  - He weighed only seventy-two pounds while the average weight for a child of that age is approximately 130 to 140 pounds.
  - He said that he was restricted from having access to food as a form of punishment.
  - Mother gave a history about the amount of food that Q.J., Jr. was provided that was very similar to the history Q.J., Jr. gave.
  - Mother stated that Q.J., Jr. would steal food and eat food out of trash cans.
  - She could not find any underlying medical condition that would explain his malnourishment, that it would take weeks to months for him to have that degree of malnourishment, and that he would be at risk for significant negative health complications if he continued to have that degree of malnutrition in the near future.
  - Mother did not believe Q.J., Jr. was malnourished, even after Dr. Demetris spoke with her at length in an attempt to help her understand why it was her medical diagnosis that he had severe malnutrition.
- Dr. Demetris' testimony to the following about Q.J.:
  - He had also been admitted to the hospital for malnutrition.
  - His prealbumin levels were on the low end of normal, and he had elevated liver functions tests and low Vitamin D levels.

- It would have taken at least weeks to months to have his degree of malnutrition, there was no underlying medical condition that could explain Q.J.'s malnutrition, he would be at risk for medical complications in the near future if he continued to have that degree of malnutrition.
- Dr. Beach's testimony that she agreed with Q.J., Jr.'s diagnosis of malnutrition because his body mass index was less than 1st percentile and because his labs were low.
- Dr. Beach's testimony that she agreed with Q.J.'s diagnosis of malnutrition because his body mass index was less than the 1st percentile.
- Sabau's testimony that Q.J., Jr. has been diagnosed with post-traumatic stress disorder and that he told her that he was forced to walk around the house in nothing but underwear, forced to exercise all day, hardly ever got to eat, and that he was punished if he tried to steal food from somewhere in the house.
- Lill's testimony to the following:
  - When she spoke with the five Children on August 27, they said they had not yet eaten that day.
  - Mother stated that Q.J., Jr. had ruined their lives and Mother talked about how they discipline Q.J., Jr. using exercise, taking away snacks, and taking away his clothes so he was only allowed to wear his underwear.
  - Q.J., Jr. he was supposed to be 15 years old soon and he looked like a 9-year-old, he was sickly looking, and he had bruises along his spine.
  - Q.J. was so thin you could see his bones and his eyes were all sunken in and red. He also had similar bruises to Q.J., Jr.

[32] That evidence demonstrates that the Boys had been deprived of food to the point of severe malnourishment. That evidence shows that the parent's actions or inactions have seriously endangered the Boys, that the Boys' needs are unmet, and that those needs are unlikely to be met without State coercion. *See In re S.D.*, 2 N.E.3d at 1287. We therefore hold that sufficient evidence

supports the trial court's findings, and its findings support its conclusions with respect to Indiana Code Section 31-34-1-1.[3]

[33] Father also asserts that the trial court erred when it relied on Dr. Demetris' testimony that Q.J., Jr. and Q.J. were malnourished and had been physically abused. This is simply a request that we reweigh the evidence which we cannot do. *See In re D.J.*, 68 N.E.3d at 577.[4]

## The Girls

[34] Father also asserts that the court erred when it found that the Girls are CHINS because there was insufficient evidence to show "that their physical and emotional conditions were seriously impaired or seriously endangered by their exposure to their parents and home life." Appellant's Br. at 28. He further asserts that DCS' witnesses could only testify as to "what *could* happen to the four female children, rather than testifying to existing neglect or physical abuse." *Id.* (emphasis in original).

---

[3] The trial court also adjudicated the Boys to be CHINS pursuant to Indiana Code Section 31-34-1-2. Because we hold that there is sufficient evidence to support the trial court's adjudication of the Boys as CHINS pursuant to Indiana Code Section 31-34-1-1, we need not decide whether there was sufficient evidence to support the trial court's finding that the Boys are CHINS under Indiana Code Section 31-34-1-2.

[4] Father also contends that Dr. Demetris erred in relying on statements that Q.J., Jr. made to her when she determined that Q.J., Jr. was only receiving fifty percent of his recommended caloric intake. Father asserts that it was error for her to rely on the statements because Q.J., Jr. was unable to provide specific portion sizes and because there would be some error in the calculation. However, it is clear from the record that Dr. Demetris did not only rely on Q.J., Jr.'s statements. Dr. Demetris also spoke with Mother who gave a similar history regarding the amount of food Q.J., Jr. ate. Dr. Demetris also reviewed the laboratory data, which supported her diagnosis of malnutrition.

[35] DCS alleged that the Girls were CHINS pursuant to Indiana Code Section 31-34-1-1, which again requires that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and that those needs are unlikely to be met without State coercion. *See In re S.D.*, 2 N.E.3d at 1287.

[36] We agree with DCS that the evidence most favorable to the trial court's findings supports its conclusion that the Girls were CHINS pursuant to Indiana Code Section 31-34-1-1. DCS introduced the following evidence at the fact-finding hearing:

- The clinical interview and assessment of Bre.J., in which Bre.J. reported that her parents make her brothers work hard and do chores until 4:00 A.M., that Father has a history of smacking her brother, that she has witnessed Father hit her brother, and that she has witnessed verbal arguments between Mother and Father.
- The clinical interview and assessment of Ba.J., in which Ba.J. reported that her parents have a history of domestic disputes, including one incident where her mother reportedly held a knife and scissors up to her father's neck; that she is fearful when she witnesses the domestic violence between her parents; that Father has whooped her on several occasions; that she has seen Mother attempt to kill Q.J., Jr.; and that she is struggling with depression, anxiety, and trauma-related symptoms.
- Lill's testimony to the following:
  - When she spoke with five of the Children on August 27 at 3:00 PM, they said they had not yet eaten that day.
  - Bre.J. said she had been getting whooped.
- Rush's testimony that:
  - She works with Bre.J. and Ba. J. to address trauma that the two girls have reported to her.
  - The two girls told her they were not ready to go home.
  - Bre.J. reported that there were some very physical punishments and that food was removed as a punishment.

- Bre.J. said there was a lot of arguing in the home.
- Bre.J. and Ba.J. told her that their siblings were deprived of food and that there was physical abuse.
- Bre.J. and Ba.J. both said that they were encouraged to participate in the physical abuse of a sibling when that sibling was in trouble.
- Allen's testimony that Bro.J. is afraid of visits and of going home.

[37] Thus, the evidence most favorable to the trial court's findings shows that at least two of the Girls have been physically abused, that all of the Girls have been exposed to domestic violence between Mother and Father that has occurred in the home, that the Girls were exposed to the abuse and extreme punishment of the Boys, and that the Girls were encouraged to participate in the violence against a sibling when that sibling was in trouble. The evidence supports the trial court's findings that the parent's actions or inactions have seriously endangered the Girls, that the Girls' needs are unmet, and that those needs are unlikely to be met without State coercion. *See In re S.D.*, 2 N.E.3d at 1287. And those findings support the trial court's judgment. In light of the evidence most favorable to the judgment, we cannot say that the trial court's adjudication of the Girls as CHINS is clearly erroneous.[5]

---

[5] In its brief on appeal and in its appendix, DCS provided evidence that Father pleaded guilty to one count of neglect of a dependent, as a Level 6 felony, and one count of neglect of dependent resulting in bodily injury, as a Level 5 felony. DCS argues that "[t]he Indiana Supreme Court and this Court ha[ve] held that parties are required to let this Court know of 'post-judgment events which may affect the outcome of a pending appeal.'" Appellee's Br. at 33 (quoting *In re C.B.M.*, 992 N.E.2d 687, 693 (Ind. 2013)). And DCS asserts that Father's guilty plea would affect the outcome of his appeal because it contradicts Father's argument that there is insufficient evidence to support the trial court's finding that the Children are CHINS. In his reply brief, Father claims DCS' inclusion of his guilty plea was improper because it was not part of the record on appeal, DCS failed to file the proper motions to bring the additional evidence before this Court, and because the inclusion does not render his appeal moot. However, the error, if any, in the inclusion of

## Issue Four: Effective Assistance of Counsel

[38] Finally, Father asserts that he was denied the effective assistance of counsel. Specifically, he claims that, following the CHINS determinations, his court-appointed counsel should have filed a motion for relief from judgment under Indiana Trial Rule 60(B)(2) because the psychological evaluation of Q.J. was not conducted until June 9, 2017, and the report was not filed with the trial court until August 14, 2017, almost five months after the trial court issued its order that adjudicated the Children to be CHINS on March 28, 2017.

[39] Indiana Code Section 31-34-4-6 entitles Father to an attorney at each court proceeding on a CHINS petition. But Father was represented by counsel in the trial court at each proceeding on the CHINS petitions. And Father has not directed us to any case law that says that that statute creates a cause of action for ineffective assistance of counsel in a CHINS proceeding, or under what standard such a claim might be determined.

[40] In any event, we need not decide whether this claim is available to him for the purposes of this appeal because we conclude that, had his attorney filed a motion for relief from judgment, it would not have been successful. Indiana Trial Rule 60(B)(2) provides relief from judgment for newly discovered evidence. "Relief from judgment based on newly discovered evidence requires a showing that the newly discovered evidence is material, is *not merely*

---

Father's guilty plea is harmless. As discussed above, there is ample evidence in the record to support the trial court's findings that the Children are CHINS without considering Father's guilty plea.

*cumulative or impeaching,* was not discoverable by due diligence, and would reasonably and probably alter the result." *Outback Steakhouse of Fla., Inc. v. Markley*, 856 N.E.2d 65, 85 (Ind. 2006) (emphasis added).

[41] Father asserts that some of the statements Q.J. made in his psychological evaluation "are in direct contrast to the testimony of Dr. Demetris regarding statements made by Q.J.[,] Jr." Appellant's Br. at 30. In essence, Father claims that Q.J.'s psychological evaluation could be used to impeach Dr. Demetris. Because the newly discovered evidence would merely be impeaching, Father would not have been entitled to relief from judgment. *See Outback Steakhouse*, 856 N.E.2d at 85. Because a Trial Rule 60(B)(2) motion would have failed, he cannot show that he was denied the effective assistance of counsel.

[42] In sum, we hold as follows: the trial court did not abuse its discretion when it allowed Dr. Demetris to testify about the statements Q.J., Jr. made to her regarding the source of his bruises and malnutrition; there was sufficient evidence to support the trial court's finding that the Children are CHINS; and Father was not denied the effective assistance of counsel. As such, we affirm the trial court's adjudication of the Children as CHINS.

[43] Affirmed.

Mathias, J., and Barnes, J., concur.