## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 21 2020, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT
MOTHER

Robert E. Shive
DawnMarie White
Emswiller, Williams, Noland & Clarke, LLC
Indianapolis, Indiana

APPELLANT FATHER PRO SE

Q.J., Sr.
Greencastle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship, Q.J., Bre.J., Ba.J., Bri.J., and Bro.J. (Minor Children),

and

B.J. (Mother) and Q.J., Sr. (Father),

*Appellants-Respondents*,

v.

December 21, 2020

Court of Appeals Case No.
20A-JT-63

Appeal from the Hamilton Superior Court

The Honorable David Najjar, Special Judge

Trial Court Cause Nos.
29D05-1902-JT-183
29D05-1902-JT-184
29D05-1902-JT-185
29D05-1902-JT-186
29D05-1902-JT-187

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Brown, Judge.**

[1] Appellants B.J. ("Mother")[1] and Q.J., Sr. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights to their children, Q.J., Bre.J., Ba.J, Bri.J., and Bro.J.  We affirm.

### Facts and Procedural History

[2] Parents' children include: Q.J., Jr. who was born on September 11, 2001,  Q.J. who was born on December 28, 2002, Bre.J. who was born on May 19, 2005, Ba.J. who was born on December 31, 2008, Bri.J. who was born on June 25, 2011, and Bro.J. who was born on May 17, 2013 (collectively, but without Q.J., Jr.,[2] the "Children").

[3] On August 30, 2016, the Indiana Department of Child Services ("DCS") filed petitions alleging the Children and Q.J., Jr. were children in need of services ("CHINS").  The petitions alleged material facts consistent with each other. Q.J.,

---

[1] In its brief, the Indiana Department of Child Services states that, "at the time of writing this brief, [its counsel] heard that Mother recently passed away" and "contacted her counsel and advised him of the same." Appellee's Brief at 5 n.1.  As of the time of writing, our review of Odyssey reveals Mother's counsel has not indicated that she is deceased.

[2] The trial court's termination orders note that a termination case involving Q.J., Jr. was dismissed because of his age.

Jr.'s petition indicated he had been removed from Parents and alleged: on August 25, 2016, law enforcement officers took Q.J., Jr. to the hospital; he was found to be severely malnourished, weighing 70 pounds at nearly fifteen years of age; he had bruising on his body consistent with abuse; he had reported that his parents discipline him and his siblings by withholding food, forcing them to do excessive exercise, and with corporal punishment which included Father punching him and Mother beating him with a shoe; he had run away from home multiple times to escape the neglect and abuse; and that, upon examination at the hospital, he had muscle damage due to the high intensity of forced exercise and malnourishment as well as elevated liver enzymes which may be from the repeated beatings. That same day, the trial court ordered detention of the Children in orders which indicated that Parents' abuse and neglect appeared to be a prolonged and overall scheme of care for Q.J., Jr., there was a high probability that the care of the Children would not be any different, the Children had witnessed the abuse of Q.J., Jr., and they had been forced to enter into his abuse by Parents. On September 28, 2016, the court issued orders in each of the CHINS cases after a hearing and appointed counsel for Father.

[4] On March 28, 2017, the court issued orders in each of the CHINS cases which indicated: at the August 2016 detention hearing, the court ordered Mother to disclose the whereabouts of the Children; upon her disclosure, law enforcement found Father and the Children at a local hotel and discovered that Parents

registered for the room under the name Br.Hu.[3]; the Children were forensically interviewed and taken to the hospital for evaluation; and Q.J. was admitted to the hospital. The physician director of the Child Protection Team determined Q.J., Jr. had been abused, and the court adopted the director's findings and diagnoses.[4]

[5] In early June 2017, the court issued dispositional orders which ordered Parents into reunification services, Father appealed, and this Court later affirmed in *Q.J., Sr. v. Ind. Dep't of Child Servs.*, 92 N.E.3d 1092 (Ind. Ct. App. 2018), *reh'g denied*, *trans. denied*. The court later issued dispositional orders in August 2017 which ordered Parents into further general services; to participate in individual therapy; to participate in couples counseling; to ensure proper clothing, food, and child supervision; and to meet all personal medical and mental health needs of the family. At the conclusion of an evidentiary hearing held over four days from January to April 2018, the court found that Parents had not complied with the Children's case plan and that, although Parents were participating in services,

---

[3] The court's November 10, 2016 Order Regarding Parenting Time states that Father "absconded with the children to conceal their whereabouts when DCS initiated its investigation while [Q.J., Jr.] was detained. It appears further that the parents have sheltered or excluded the children from public exposure and have encouraged the children not to cooperate with persons inquiring about family matters." Exhibits Volume X at 60.

[4] The orders states that pictures of Q.J. and Q.J., Jr. were taken on or about August 2016 and indicates that Q.J.'s pictures show him "to be of extremely small stature, very thin and young in appearance for his age," his bones "extruding beyond what appears to be normal for a child his age as though tissue is missing around his joints," and to have "bruises and lesions to his back which the court finds to be the result of him being beaten by Father as described by [Q.J., Jr.] and by [Bre.J.]." Exhibits Volume X at 203 (Q.J.'s order). *Accord* Exhibits Volume XI at 86 (Bre.J.'s order), 218 (Ba.J.'s order); Exhibits Volume XII at 99 (Bri.J.'s order), 227 (Bro.J.'s order).

they were not making progress in their ability to safely and appropriately parent the Children.

[6] On the same day, the court issued a sixteen-page order as to all the Children, which: found that restoring or establishing visitation between Parents and the Children presented a substantial risk to their physical, emotional and mental well-being; denied Parents' request for visitation; found a permanency plan for adoption to be in the Children's best interest and changed the permanency plans to include adoption; found that a continuation of services to Parents would not remedy or change their manner of thinking toward the Children; terminated services to Parents; and found the assessments and opinions of Mother's therapist were based solely upon Mother's own representations, to be of no value, and should be afforded little to no weight. The order indicated that, after almost two years of separation from Parents, none of the Children's therapists recommended that any of them have contact with Parents at that time due to the emotional dysregulation exhibited by the Children in response to their various traumas. It detailed the testimony at the evidentiary hearing of several service providers, including the director of the facility that provided placement and services to Q.J., who stated Q.J. was

> identified as having a complex trauma narrative meaning that he has suffered multiple traumas. [Q.J.'s] trauma narrative is twofold. His trauma relates to both his removal from the home and the conduct demonstrated toward him within the home. . . . Since removal, [Q.J.] has demonstrated many self-harming behaviors which his therapist attributes, not to his removal, but to the trauma endured in his parents' home. . . .

Exhibits Volume X at 249-250. According to the order, Bre.J. and Ba.J. exhibited behavioral challenges and had seen a therapist since the inception of the CHINS cases; Bre.J. remained close-minded to therapy in addressing her trauma and needed to work on emotional regulation; and Ba.J. had verbalized that she witnessed Mother make threats against Father with a knife, experienced a gun held at her person when someone broke into the home, and had to sneak food to her siblings because they were not being fed. The order stated that visitation with Parents would likely be emotionally harmful and potentially lead to a relapse in treatment; and that Bri.J. and Bro.J. had been working with a therapist for the previous one and one-half years, had not seen Parents since a supervised visit in December 2016, and exhibited fear and a desire not to see Parents. The order stated that a parenting instructor, having conducted approximately thirty sessions since January 19, 2018, reported Parents were unable to understand or recognize their previous parenting skills were detrimental to the Children's well-being, did not acknowledge the need for DCS involvement, had acted hostile when their views on parenting were challenged, rejected eighty percent of the instruction offered to them, and had otherwise failed to recognize that inappropriate parenting techniques should not be utilized. The order indicated that neither Mother nor Mother's personal therapist since October 2017 discussed the court's findings of abuse or the medical records and psychological evaluations of the children; Mother presented herself to the therapist in a misleading fashion and failed to direct her therapist to certain court findings; Father continued to deny purposefully withholding food from any of the children and rejected parenting instruction; and Father's therapist could not

answer as to how the Children could be safely returned to the home if Father's foundational belief in wrongdoing toward them remained unchanged.

[7] Following a hearing, the court issued an order on September 5, 2018, indicating Parents had not complied with the case plans, and that Mother was incarcerated with an earliest possible release date of December 2019 after being convicted of two counts of neglect of dependent as level 5 and 6 felonies, with the two oldest children as the victims. The order indicated that Father, who had also been convicted of the same charges, was incarcerated due to alleged non-compliance with Community Corrections Placement and violation of probation, and was also incarcerated for pending charges of child molesting as a level 1 felony, and incest as a level 4 felony with respect to one of the children.

[8] On February 1, 2019, DCS filed termination petitions. In April 2019, the court held the first of three termination hearing dates, admitted underlying certified court records as Petitioner's Exhibits 1 through 6, and dealt with procedural and preliminary issues. When Father expressed a desire to represent himself, the court discussed the dangers and disadvantages of self-representation, *see* Transcript Volume IX at 17-25, and clarified that it thought Father "wanted an attorney that's gonna do the things that you want your attorney to do." *Id.* at 25. Father responded, "I do," and the court explained that it was not removing counsel from the case at that time and that Father "absolutely ha[d] the right to hire [his] own attorney and to proceed forward with that attorney, but at this point, going forward at least for the time being, I find that [Father's counsel] is

doing the job that we asked him to do, and he will remain as [his] attorney." *Id.* at 25-26.

[9] On June 17, 2019, the court held a hearing on a motion for continuance filed by Parents. DCS maintained its objection, Parents waived the statutory framework involving the 180-day deadline, and the court granted the continuance.

[10] On October 30, 2019, Father appeared in person and by counsel at the continued termination hearing, and Mother's counsel moved for another continuance and stated that Mother, who was absent, was released from incarceration, did not have a stable residence, and was living at a homeless shelter. DCS opposed the motion, explained Mother was located in Terre Haute, presented the testimony of a family case manager who indicated she spoke with Mother, informed her that transportation had been set up for her for each of the days of the hearing, and called back a second time to let her know that she was not canceling the transportation. DCS also presented the testimony of the chief operating officer at Family Community Corrections who had driven from Indianapolis to Terre Haute the night prior and met Mother at the door of the shelter, who "basically said that she was not going, she didn't know why I was there because she'd already informed people that she was not coming today." Transcript Volume II at 13. Counsel for Father indicated that he believed Mother was "an essential witness and a help to the defense in this case" and joined in the motion, and the court denied the motion. *Id.* at 16. On October 31, 2019, Father appeared in person and by counsel and Mother appeared by counsel. The court issued termination orders which were twenty pages in length in which it found Father

had pled guilty to neglect of a dependent, a level 6 felony; his earliest possible release date from the DOC was September 9, 2022; Mother was released from prison shortly before the October 30, 2019 hearing but refused to attend the hearing or to accept an offer of transportation to the hearing by DCS; and that she did not have stable housing and was potentially already in violation of the terms of her probation. After indicating the Children had been out of Parents' home for over three years, the orders stated Father had filed numerous motions arguing that he should be permitted to see his children which painted him as a loving and caring parent, and that the court found that, based on the totality of the evidence and with particular weight given to statements to his therapist and Mother during phone calls from jail, Father was more concerned with his rights than with what may be in the best interests of the Children. The orders indicated the Children were in need of permanency in a safe environment where appropriate discipline is utilized without endangering them, that neither parent could provide such an environment, and that "DCS had a satisfactory plan for the care and treatment of each of the children, which is adoption. The Guardian ad Litem testified that she is in agreement with this plan." *E.g.*, *id.* at 108. The orders found there was a reasonable probability that the conditions that led to the Children's removal or the reasons for placement outside Parents' home will not be remedied; there was a reasonable probability that the parent-child relationship poses a threat to the Children due to Parents' continued mindset that they did not cause any harm to their children; and that termination was in the best interests of the Children.

## *Discussion*

[11]    The United States Supreme Court "has 'recognized on numerous occasions that the relationship between parent and child is constitutionally protected,' and that '[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.'" *In re Adoption of C.B.M.*, 992 N.E.2d 687, 692 (Ind. 2013) (internal quotations omitted) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549 (1978); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388 (1982)). However, these protected parental rights are not absolute and must be subordinated to the children's interests to maintain the parent-child relationship. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[12]    When reviewing the termination of parental rights, we do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *See In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not

a license to reweigh the evidence. *Id.* Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[13] The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[14] We first address Mother's arguments concerning due process. To the extent she argues that her absence at the final termination hearing violated her rights, we note that the court, upon her counsel's indication that her treatment needed to be continuous, granted Parents' motion to continue factfinding at the April 30th hearing over DCS's objection and reset the hearing for October 2019. Furthermore, Mother was represented by counsel at both October 2019 hearings, and we observe that, whereas Mother was released from prison prior to the October 30, 2019 hearing, the court found she had refused to attend the hearing and refused to accept DCS's arrangement for transportation from Terre Haute by the chief operating officer at Family Community Corrections. Under these circumstances, we do not agree that Mother's rights were violated.[5]

[15] In arguing procedural irregularities in the CHINS cases contributed to the termination of her parental rights, Mother cites the Indiana Supreme Court's observation in *In re G.P.* that CHINS and termination of parental rights ("TPR") proceedings are "deeply and obviously intertwined to the extent that an error in the former may flow into and infect the latter," 4 N.E.3d 1158, 1165 (Ind. 2014). She likens her circumstances to two cases, *In re T.W.*, 135 N.E.3d 607 (Ind. Ct.

---

[5] We cannot agree that the October 30, 2019 denial of Mother's motion to continue violated her rights given Parents' previous waiver on June 17, 2019.

App. 2019), *trans. denied*, and *Matter of C.M.S.T.*, 111 N.E.3d 207 (Ind. Ct. App. 2018), and asserts she and Father were "set up to fail" when a new parenting educator was not referred despite the family case manager ("FCM") being alerted to difficulties in the relationship between the educator and Parents, her individual therapist was not provided information, therapists' recommendations for Father to have communication with Children were ignored, and "couples counseling" was not possible due to incarceration of one or both parents. Appellant Mother's Brief at 27. Although we heed the *In re G.P.* Court's observations, we find Mother's reliance on *In re T.W.* and *Matter of C.M.S.T.* inapposite. Unlike in *In re T.W.*, where DCS "wholly failed to make reasonable efforts to preserve that relationship" and we observed that the parent was "entitled to try to become a safe and appropriate parent to Child, and DCS [was] required to help him do so," 135 N.E.3d at 619, or in *Matter of C.M.S.T.*, where procedural irregularities such as multiple FCMs, inappropriate behavior by FCMs, and apparent bias of FCMs contributed to the parents' non-compliance, *see, e.g.*, 111 N.E.3d at 210-212, Parents received services over three years to no avail, as the trial court found in its September 5, 2018 order and, later, in its termination orders.

[16] With respect to Father's argument that the court violated his right to represent himself, we find that, upon hearing the court's advice on the dangers and disadvantages of self-representation, Father changed his mind from wanting no representation, and answered, "I do," when the court stated "I think you want an attorney that's gonna do the things that you want your attorney to do." Transcript Volume IX at 25. Under these circumstances, the court did not

commit reversible error when it found that his counsel was doing the job asked of him and ruled that, "at this point, going forward for the time being," his counsel would remain. *Id.* at 26.

[17] Parents' arguments alleging ineffectiveness of representation are similarly unavailing. We note the Indiana Supreme Court's recent articulation of the method for assessing ineffective-assistance-of-counsel claims in TPR proceedings in *A.M. v. State*:

> In *Baker* [*v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035 (Ind. 2004) (declining to apply *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), to assess counsel's performance in cases involving termination of parental rights)], this Court, when considering the method of assessing an ineffective-assistance-of-counsel claim in TPR proceedings, rejected both the *Strickland* and *Baum*[6] standards. [810 N.E.2d] at 1036-37. The Court opted instead to tweak *Baum*'s due process test to address the important interests at stake:

> > Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the

---

[6] *See Baum v. State*, 533 N.E.2d 1200, 1201 (Ind. 1989) (declining to apply *Strickland*'s "rigorous standard" to assess the performance of counsel in post-conviction cases).

> children from parental care are unlikely to be remedied and
> that termination is in the child's best interest.
>
> *Id.* at 1041 (footnote omitted).  In articulating this test, this Court
> reasoned that, "[b]ecause of the doctrine of Parens Patriae and the
> need to focus on the best interest of the child, the trial judge, who
> is the fact finder, is required to be an attentive and involved
> participant in the process."  *Id.* (quoting *In re Adoption of T.M.F.*,
> 392 Pa.Super. 598, 573 A.2d 1035, 1042-43 (1990)).  We observed
> that, since TPR and juvenile proceedings require "judicial
> involvement that is much more intensive" than in most criminal
> cases, "the role of the lawyer, while important, does not carry the
> deleterious impact of ineffectiveness that may occur in criminal
> proceedings."  *Id.* (quoting *In re Adoption of T.M.F.*, 573 A.2d at
> 1042–43).

134 N.E.3d 361, 367-368 (Ind. 2019) (footnotes omitted), *reh'g denied*, *cert. denied*, --- S.Ct. ---- (Oct. 5, 2020).  We conclude that Parents received a fundamentally fair termination hearing and, accordingly, that they have failed to demonstrate that their representation was ineffective.

[18]     We next turn to Parents' argument that the termination orders were not supported by sufficient evidence.  As noted, the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).  In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis.  *See E.M.*, 4 N.E.3d at 642-643.  First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied.  *Id.* at 643.  In the second step, the trial court must judge a parent's fitness as of the time of the termination

proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* While incarceration alone cannot serve as a basis for termination of parental rights, it is well-settled that a trial court may evaluate the parent's habitual patterns of conduct to assess the likelihood that the children could experience future neglect or deprivation; and give considerable weight to the parent's history of incarceration and the effects upon the children. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (holding that the parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child, that DCS is not

required to prove a parent has no possibility of changing; and that DCS need only establish a reasonable probability that no change will occur), *trans. denied.*

[19] To the extent Parents do not challenge certain findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied.*

[20] The record reveals Parents' pattern of continued hostility to having their views on parenting challenged, resistance to recognition of the detrimental effects their parenting had on Children's well-being, and rejection of instruction to the contrary over the course of thirty sessions conducted since January 2018. Mother was convicted of two counts of neglect of dependent as level 5 and 6 felonies with the two oldest children as the victims, Father pled guilty to one count of the same as a level 6 felony, and he was incarcerated due to alleged non-compliance with Community Corrections Placement and violation of probation. During the pendency of the proceedings involving Children, Father was charged with child molesting, a level 1 felony, and incest, a level 4 felony with respect to one of his children, and his earliest possible release date from the DOC as of the termination of the parent-child relationships was September 9, 2022. As of October 31, 2019, the Children had been placed outside of Parents' home for over three years, and they are in need of permanency in a safe environment where appropriate discipline is utilized without endangering them. The court found that Parents could not provide such an environment and that, in the three years of DCS involvement, Parents made no demonstrable progress in enhancing

their ability to safely and appropriately provide for the care and supervision of any of their children. The court additionally found DCS's plan for adoption satisfactory for the care and treatment of the Children, and a guardian ad litem testified in agreement with the plan. In light of the unchallenged findings and evidence set forth above and in the record, we cannot say the trial court clearly erred in finding that a reasonable probability exists that the conditions resulting in the Children's removal or the reasons for their placement outside Parents' care will not be remedied.

[21] For the reasons stated above, we affirm the court's termination orders.

[22] Affirmed.

Robb, J., and Crone, J., concur.